VIOLA GLADDEN, PLAINTIFF-RESPONDENT, v. CADILLAC MO-
TOR CAR DIVISION, GENERAL MOTORS CORPORATION, A
CORPORATION LICENSED TO DO BUSINESS IN THE STATE
OF NEW JERSEY, DEFENDANT, AND UNIROYAL, INC., DE-
FENDANT-APPELLANT, AND LEX DEPP CADILLAC, DE-
FENDANT.

Argued November 27, 1979—Decided June 30, 1980.

*David L. Menzel* argued the cause for appellant (*Stryker, Tams & Dill*, attorneys).

*Daniel R. Coburn* argued the cause for respondent (*Coburn & Bronstein*, attorneys).

The opinion of the Court was delivered by

HANDLER, J.

Plaintiff seeks to recover from Uniroyal, Inc. (hereinafter "Uniroyal"), a national automobile tire manufacturer, property damages for the total loss of her automobile based upon breach of express warranty covering the automobile's tires. Plaintiff claimed that the right rear tire failed while the car was being driven by her brother, causing the car to leave the road and strike a guardrail and tree. Uniroyal disputed that the tire's failure under the circumstances constituted a breach of its warranty. It also asserted that, in any event, its liability for

such a warranty breach was limited to a refund for or replacement of that tire. On the authority of *Collins v. Uniroyal, Inc.*, 64 *N.J.* 260 (1974), the trial court ruled that this limitation of liability was ineffective. It is this ruling, sustained by the Appellate Division, which is the focus of this appeal.

I

Plaintiff Viola Gladden was the owner of a 1974 Coupe de Ville hardtop Cadillac automobile. Her younger brother, Larry Brown, was driving the automobile from South Carolina to Morristown, New Jersey and, on September 1, 1975, while traveling easterly on Route 22 near Harrisburg, Pennsylvania, the automobile left the roadway and struck a guardrail and tree. As the car left the road, both Brown and his passenger heard a "big pop" or "pow-like" noise; the right rear tire was later discovered about two feet from the scene of the accident.

Plaintiff bought the new automobile for her brother in July 1974, although Brown handled the actual purchase. Brown testified that he had thought that he was getting a "top-notch car" which should have the "better tires" and he therefore requested "steel-belted radials." He further testified that steel-belted radial tires were advertised on television and in newspapers and although he did not request any particular brand of tires, he was sold Uniroyal tires. Distributed with the tires was a booklet described in large letters on the front cover as "OWNER'S GUIDE AND GUARANTEE," which contained a section in bold, red printing encaptioned "UNIROYAL STEEL BELTED RADIAL TIRE GUARANTEE." Brown testified that he had "skimmed through" the guarantee booklet and that he had thought that he understood its contents.

Seeking only property damages for the loss of the automobile, plaintiff brought a lawsuit against the Cadillac Motor Car Division of General Motors Corporation, Lex Depp Cadillac, and Uniroyal, Inc. Summary judgment for defendant Lex Depp Cadillac was granted prior to trial. The cause of action against Cadillac Motor Car Division was dismissed upon plaintiff's failure to establish a prima facie case.

At trial, plaintiff's theory of liability against Uniroyal was predicated upon her expert's claim that the automobile had gone out of control and had left the road after the right rear tire blew out either because of some factor relating to the road, or because of a defect in the manufacturing, the mounting, or dismounting of the tire. The defendant and its expert contended that, after the automobile had left the roadway, the tire failed when the vehicle struck the guardrail and tree. The case was sent to the jury on theories of strict liability, implied warranty, and express warranty. Answering special interrogatories, the jury found that the tire was not defective but, that Uniroyal had, nevertheless, breached its express warranty. Uniroyal's motion for a judgment notwithstanding the verdict was denied and the jury award of $6,250 plus interest for property damage to plaintiff's car was entered.

On appeal, Uniroyal contended that the evidence of a breach of warranty was inadequate and that the trial court had erred in submitting this issue to the jury. It also asserted that its guarantee did not constitute a promise that the tires would not fail but only a promise that, if there were a tire failure, the tire would be replaced or the purchase price would be refunded on an apportioned basis. For that reason, Uniroyal contended that the trial court had erred in ruling that the guarantee, which restricted its liability as to damages, was unconscionable and, thus, unenforceable.

The Appellate Division in an unreported decision reversed on the ground that the trial court had given an incorrect or inadequate instruction to the jury on the express warranty question. It concluded that a new trial should have been granted. The appellate court, however, rejected Uniroyal's contentions with respect to the validity of the remedy restrictions of the guarantee. Uniroyal's petition for certification, granted at 81 *N.J.* 285 (1979), sought review only of the question of the validity of the remedy restriction which appears in the warranty.

## II

The initial question is whether Uniroyal's undertaking constituted an express warranty. The Uniform Commercial Code (hereinafter the "UCC" or "Code"), *N.J.S.A.* 12A:1–101 *et seq.*, deals with the creation of warranties. It provides as follows:

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

. . . . . . . .

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty. [*N.J.S.A.* 12A:2–313.]

The UCC Comments to this section emphasize that no specific intention to make a warranty is necessary if part of the basis of the bargain consists of the seller's affirmations of fact or descriptions of the goods. *N.J.S.A.* 12A:2–313, Comment 3. The Comments state further that express warranties rest on "dickered" aspects of the individual bargain. *N.J.S.A.* 12A:2–313 , Comment 1. Particular reliance on such statements of description or quality need not be shown and the warranty issue will be normally a factual one. *N.J.S.A.* 12A:2–313, Comment 3.

As noted, the booklet distributed by Uniroyal with the purchase of its steel-belted radial tires contained a section entitled "UNIROYAL STEEL BELTED RADIAL TIRE GUARANTEE." It expressly "guaranteed [the tires] for 40,000 odometer miles" in three specific situations, two of which arguably apply to this case. One such situation relates to "road hazard protection" which furnishes a guarantee "[i]f within 40,000 vehicle odometer miles the tire becomes unrepairable due to impact breaks, snags, cuts or punctures . . . ." The other, referred to as a "[g]eneral [g]uarantee," applies "[i]f a tire becomes unserviceable, for any reason other than wearout or [those enumerated in] the specific road hazards [guarantee] . . . ."

An express warranty under the Code can arise even though the word "warranty" is not used. *N.J.S.A.* 12A:2–313(2). Guarantees are viewed as warranties under New Jersey case law. See *Jutta's Inc. v. Fireco Equipment Co.*, 150 *N.J.Super.* 301, 306 (App.Div.1977); *Adams v. Peter Tramontin Motor Sales, Inc.*, 42 *N.J.Super.* 313, 319 (App.Div.1956). In *Jutta's Inc.*, the Appellate Division, calling the manufacturer's guarantee an "express guarantee," treated it as an express warranty. 150 *N.J.Super.* at 306. In *Adams*, the Appellate Division held that a 90-day guarantee of repair or replacement of parts constituted an express warranty because it was made before the sale, was given to the buyer "in case anything went wrong," and had a "natural tendency" to induce the sale of the automobile. 42 *N.J.Super.* at 319. Similarly, guarantees were treated as express warranties in *Collins v. Uniroyal, Inc.*, 64 *N.J.* 260 (1974). See also *McCarty v. E. J. Korvette, Inc.*, 28 *Md.App.* 421, 427, 347 *A.2d* 253, 258 (Ct.Spec.App.1975) (tire guarantee is express warranty). Hence, it is of no legal significance that Uniroyal's undertaking with respect to its tires was denominated a "guarantee" rather than a "warranty." Its obligation was an express warranty if it could fairly be understood, regardless of Uniroyal's intent, to constitute an affirmation or representation that the tires possessed a certain quality and capacity relating to future performance.

The provisions of the tire guarantee were included in the "OWNER'S GUIDE AND GUARANTEE." That booklet deals extensively with the characteristics, quality, capacity, and performance of Uniroyal steel-belted radial tires. It states, for example, that "[t]he radial design provides superior tread mileage, traction and lower rolling resistance . . . ." The tire is said to be "engineered to provide a proper balance" as to certain "performance characteristics," *e. g.* "tread mileage, traction, endurance, road hazard resistance." In addition, the booklet is replete with references to "guarantee." The word "guarantee" is prominently displayed on the cover; on the very first page the owner is advised that the booklet contains "40,000 mile guarantee provisions." A separate section of the booklet alerts

the purchaser in bold type to the "UNIROYAL STEEL BELT-ED RADIAL TIRE GUARANTEE," and throughout that section the term "guarantee" appears both in subject headings (e. g., "What is Guaranteed And For How Long,") as well as in descriptive language (e. g., "guarantee eligibility," "general guarantee," "tire guarantee.") This section also deals specifically with future performance in terms of a tire becoming "unrepairable" or "unserviceable." Moreover, another page containing what is called "adjustment claim forms," is denominated as "Uniroyal Steel Belted Radial Passenger Tire Mileage Guarantee Certificate."

In a section dealing with exclusions, the guarantee states that it is a substitute for any "other express or implied warranties, including but not limited to any implied warranties of merchantability or fitness for a particular purpose." This suggests, by negative implication, that the guarantee actually given the purchaser itself constitutes an express warranty since it serves to replace "*other* express warranties," and, further, that the guarantee was intended to be the functional equivalent of ordinary implied warranties which relate generally to product quality and performance.

The document taken as a whole firmly supports the conclusion that Uniroyal has given an express warranty in conjunction with the sale of its steel-belted radial tires. It does so in language which spells out such an undertaking with sufficient clarity and specificity. *Cf. Herbstman v. Eastman Kodak Company,* 68 *N.J.* 1, 12 (1975) (guarantees of future performance must be specific). The guarantee, as presented and expressed, constitutes an affirmation or representation that the tires possess a capacity and quality relating to their ability to perform. On the basis of this communication, a purchaser could reasonably expect that the tire if used in accordance with the Uniroyal instructions would not become unrepairable or unserviceable within the first 40,000 miles of normal use or, if it did, that the consumer would be entitled to some form of redress.

## III

The Appellate Division determined that in this case there was sufficient evidence of breach of warranty.[1] This brings us to the gravamen of the appeal, namely, whether Uniroyal has legally and effectively limited its liability for damages for a breach of the express warranty to either replacement of the failed tire or a partial or full refund of the tire's purchase price.

The language of the Uniroyal guarantee, if given literal effect as contended by Uniroyal, would limit damages recoverable for breach of warranty. While the express warranty states that the tire is "guaranteed for 40,000 vehicle odometer miles," it further provides under the general guarantee clause that the tire will be replaced at no charge if "unserviceability" occurs within 8,000 miles and, beyond that mileage up to 40,000 miles, "unserviceability" will result in pro rata charge for a new tire; similarly, if the tire at any point up to 40,000 miles becomes "unrepairable" because of "road hazards," the warranty provides for a pro rata adjustment charge.[2]

---

[1]One of the issues at trial was whether the failure of the tire under the circumstances came within the terms of the express warranty. This dispute centered on whether a "blowout" had occurred and whether such a tire blowout was covered by the express warranty. The Appellate Division noted that the terms of the guarantee in the present case with respect to the phenomenon of "blowouts" were different from those considered in the earlier decision of *Collins v. Uniroyal, Inc.*, 126 *N.J.Super.* 401 (App.Div.1973), aff'd 64 *N.J.* 260 (1974). In *Collins*, the guarantee stated specifically that when used in normal passenger car service, every tire "is guaranteed during the life of the original tread against *blowouts*, cuts, bruises, and similar injury rendering the tire unserviceable." 126 *N.J.Super.* at 405 (emphasis added). By contrast, the guarantee made by Uniroyal in the instant case does not explicitly include the term "blowout" in either the road hazard protection warranty or the general guarantee.

[2]The Appellate Division concluded in this case that there was sufficient evidence to show that a blowout of the tire on the roadway was caused by an "impact break" but that the jury had not received sufficiently clear instructions to determine whether or not a blowout had occurred in that manner. For that reason, the court remanded the case for a new trial. Since the evidence in the case would also permit another inference, *i. e.*, the tire had failed or had a blowout unrelated to an "impact break," this raises the question as to whether such a failure or blowout might nevertheless consti-

The warranty in part states by way of further exclusion as follows:

4. WHAT IS NOT COVERED BY THE GUARANTEE

a) General Exclusions applicable to all parts of guarantee.
Unserviceability or unrepairability or failure or loss due to accident, fire, chain damage, racing, theft, run flat or willful abuse.

. . . . . . . .

This guarantee is a promise of replacement under the conditions specified. It is not a promise that your tires will not fail.

*This guarantee is given in lieu of all other express or implied warranties, including but not limited to any implied warranties of merchantability or fitness for a particular purpose. It does not cover consequential damages and UNIROYAL'S liability is limited to repairing or replacing the tire in accordance with the stipulations contained in this guarantee.*

[Emphasis in original.]

These exclusions cut deeply into the substantive effect of the warranty relating to tire capacity and quality. If the failure of the tire equates with "unserviceability or unrepairability or failure or loss," but is caused by an "accident, fire, chain damage, theft, run flat or willful abuse," the resultant deficiency of the tire would not be covered at all under the warranty. Thus, even though the express warranty against "unrepairability," is first stated in the guarantee booklet as being applicable to any failure resulting specifically from impact breaks, snags, cuts, or punctures and the warranty against "unserviceability" is stated as being applicable to any failure for any other reason except "wearouts," the general exclusion restricts the scope of this coverage. Moreover, even though the express warranty deals with tire failure, described as unserviceability or unrepairability, the general exclusion section states that the guarantee is "not a promise that [the] tires will not fail." Further, the general exclusionary clause also states that it is "in lieu of all other express warranties," as well as the implied warranties of merchantability and fitness, which implied warranties clearly

tute a tire becoming "unserviceable for any reason" under the general guarantee. Although none of the parties has raised this issue either at trial or on appeal, we deem it appropriate that the parties be given the opportunity at a new trial to present this theory of breach of express warranty under the "general guarantee" clause.

relate to quality and performance and are ordinarily available to the purchaser.

The exclusionary clause deals not only with the scope of coverage and product performance—that is, whether and under what circumstances a tire might fail—but also with the extent of liability. Thus, the guarantee is described in the general exclusionary clause, not as a warranty relating to quality or performance as implied in the initial presentation of the guarantee, but merely as "a promise of replacement under the conditions specified." Further, the exclusionary clause states that the guarantee "does not cover consequential damages" and that "liability is limited to repairing or replacing the tire in accordance with the stipulations contained in this guarantee."

In determining the efficacy of Uniroyal's attempted disclaimer and restriction of its affirmative warranty, it is important to differentiate between a disclaimer of warranty and a limitation of remedy. *N.J.S.A.* 12A:2–719, Comment 3; White & Summers, *Uniform Commercial Code* § 12–11, at 383 (1972). As Professors White and Summers explain, a disclaimer clause is used to exclude or limit the seller's warranties. White & Summers, *supra*, at 384. The disclaimer limits the seller's liability by reducing the number of situations in which the seller can be in breach of warranty. *Ibid.* An exclusionary clause, on the other hand, restricts the remedies available to one or both parties once a breach has been established. *Ibid.*

The complete exclusion of express warranties is strongly disfavored in the UCC. See *N.J.S.A.* 12A:2–313, Comment 4; see also *Henningsen v. Bloomfield Motors, Inc.*, 32 *N.J.* 358, 373 (1960). An exclusion or limitation engrafted upon express warranties is inoperative to the extent its terms are unreasonably inconsistent with the express warranties that are given. *Realmuto v. Straub Motors, Inc.*, 65 *N.J.* 336, 341 n.2 (1974); *N.J.S.A.* 12A:2–316(1). On this question of warranty qualifications, it is instructive to compare the Code treatment of implied warranties. The complete exclusion of implied warranties, including warranties of merchantability and of fitness for a particular

purpose, is specifically permitted under the Code. See *N.J.S.A.* 12A:2–316. Nevertheless, in order to effect the exclusion of an implied warranty of merchantability, the language must be clear and conspicuous. *Ibid.* The Code, moreover, expressly defines "conspicuous" to mean "[a] term or clause . . . so written that a reasonable person against whom it is to operate ought to have noticed it." *N.J.S.A.* 12A:1–201(10); see also *N.J.S.A.* 12A:1–201, Comment 10. While no such requirement is explicitly imposed by the Code with respect to a disclaimer of an express warranty, it is inconceivable that such a disclaimer or limitation of an express warranty which is other than clear and conspicuous could be regarded as valid and enforceable.

The parties, as well as the courts below, concluded that the question of whether the warranty disclaimers and limitations here effectively limit Uniroyal's liability for damages turns upon notions of "unconscionability." They were strongly influenced in that direction by our decision in *Collins v. Uniroyal, Inc., supra.* In *Collins*, the plaintiff's husband was killed in an automobile accident ostensibly caused by the failure of a tire manufactured by the defendant. In a subsequent suit for breach of express warranty and strict liability in tort, the trial court excised as being unconscionable the defendant's limitation of remedy to replacement of the tires. This Court affirmed that determination based on *N.J.S.A.* 12A:2–719(3). 64 *N.J.* at 261. That section of the Code provides that while consequential damages for breach of warranty may be limited or excluded unless "unconscionable," such a limitation with respect to damages for personal injuries is "prima facie unconscionable." The Court also gave considerable weight in its conclusion to the evidence that the buyer had relied on the seller's advertisements that the tires would save his life. *Id.* at 263.

Here the presumption of unconscionability embodied in *N.J.S.A.* 12A:2–719(3) is not applicable because the presumption applies by its terms only to attempts to limit damages for personal injury arising out of a breach of warranty. *N.J.S.A.* 12A:2–719(3). We deal in this case only with a claim for property damages. This does not mean, however, that consider-

ations of fairness or unconscionability are any less relevant when reviewing warranties which contain limitations on property damages. It may be that under certain circumstances a restriction upon damages interwoven in an express warranty guaranteeing performance could be "unreasonably inconsistent" with the terms of the express warranty and, therefore, inoperative. See *N.J.S.A.* 12A:2–316(1). Moreover, the Court always retains the option in an appropriate case of declaring the limitation unconscionable under *N.J.S.A.* 12A:2–302. See *Jutta's Inc. v. Fireco Equipment Co., supra,* 150 *N.J.Super.* at 307 (consequential damages clause is unconscionable); *cf. Unico v. Owen,* 50 *N.J.* 101, 125 (1967) (*N.J.S.A.* 12A:2–302 authorizes the court to refuse to enforce any consumer contract clause which it finds unconscionable). This principle is also recognized at the outset in *N.J.S.A.* 12A:2–719(3), *viz,* "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable."

We need not, however, resolve whether or not the attempted limitation of recoverable damages for property loss from a breach of warranty is in this case unconscionable in the sense considered in *Collins* and *N.J.S.A.* 12A:2–719(3). There is an antecedent question, the resolution of which controls the extent of Uniroyal's liability here. That question is whether the terms of the remedy limitation, as expressed and presented as part of the express warranty, are so deceptive, confusing, or misleading so as to constitute an inadequate communication to purchasers concerning the meaning of the express warranty.

The courts which have found remedy limitations on property damage to be unconscionable have been strongly influenced by the fact that purchasers were misled or deceived or that the warranties were not explicit. See *Ford Motor Co. v. Reid,* 250 *Ark.* 176, 184, 465 *S.W.*2d 80, 85 (Sup.Ct.1971) (limitations which are exclusive must clearly be stated to be such); *McCarty v. E. J. Korvette Inc., supra,* 28 *Md.App.* at 434, 347 *A.*2d at 262 (express warranty cannot later be negatived); *Jutta's Inc. v. Fireco Equipment Co., supra,* 150 *N.J.Super.* at 307 (damages clause obscure and concealed and therefore invalid). In these

cases the remedy limitation clause was found to be obscure in meaning, an unfair surprise, or concealed in a provision suggesting that the buyer was receiving a benefit in the form of a guarantee. The *McCarty* court in fact admonished the manufacturer, stating that "if the appellees do not want to be liable for consequential damages, they should not expressly warrant the tire [against blowouts]." 28 *Md.App.* at 433–434, 347 *A.*2d at 262. Indeed, the Arkansas Supreme Court in *Reid* specifically stated that "[i]f the Ford Motor Company intended the repair remedy to be exclusive, as it now contends, it should have stated that intention in express language." 250 *Ark.* at 184, 465 *S.W.* 2d at 85. Similarly, in *Jutta's Inc.*, the Appellate Division found the limitation unconscionable because of the manner in which it was buried in the contract. See 150 *N.J.Super.* at 307.

Taken in its totality, an examination of the Uniroyal guarantee in this case leads to the conclusion that it is seriously lacking in clarity. As already suggested from the earlier narrative discussion of the warranty, *ante* at 326–328, the booklet presents the owner with a linguistic maze. Throughout the document there is an admixture of terms relating to quality, capacity, and performance, together with disclaimers and exclusions of coverage, as well as limitations and restrictions upon liability and remedies. There are fulsome and repeated references to the term "guarantee," seemingly relating to quality and performance followed by the rather sudden, isolated use of the term "promise," purportedly limiting the entire contractual undertaking to tire replacement. What is thus given to a purchaser is not a simple and straight-forward document defining on the one hand that which constitutes an affirmation of quality or performance and, on the other, the liability which flows from a breach thereof. Rather what is presented is a mélange of overlapping, variant, misleading, and contradictory provisions.

The fundamental deficiency of the Uniroyal guarantee arises from the attempt to enforce it not as an affirmative, albeit limited, warranty of performance but rather as a promise of tire replacement or purchase price refund subject to certain conditions. If that promise is the primary meaning of the undertak-

ing, then that obligation should have been presented visually with the same prominence and frequency given to the term "guarantee." The purchaser should not have been invited or induced to believe that he was obtaining a guarantee of performance, however circumscribed or limited, instead of a promise that either tires would be replaced or the purchase price refunded under certain circumstances. *Cf. McCarty v. E. J. Korvette, Inc., supra,* 28 *Md.App.* at 434, 347 *A.2d* at 262 (damages limitation clause cannot convert express warranty into promise to replace); *Jutta's Inc. v. Fireco Equipment Co., supra,* 150 *N.J.Super.* at 307 (damages limitation clause is obscure and concealed and is thus unconscionable); Murray, "Unconscionability: Unconscionability," 31 *U.Pitt.L.Rev.* 1, 41 (1969) (unfair surprise is an element of unconscionability); Spanogle, "Analyzing Unconscionability Problems," 117 *U.Pa.L.Rev.* 931, 949 (1969) (concealment and trickery suggest unconscionability).

In contending that these exclusions or limitations effectively restrict the scope of its warranty and its resultant liability, Uniroyal relies heavily upon *Herbstman v. Eastman Kodak Co., supra.* There the plaintiff wanted the purchase price of his malfunctioning camera refunded. The Court held that the plaintiff's remedy was limited to that stated in the warranty—repair of the camera. 68 *N.J.* at 12. In interpreting the *Herbstman* warranty, the Court held that the manufacturer did not warrant the camera to be free of mechanical defects. "Rather, the language used contemplated that such defects might occur and, if so, Kodak would repair them." *Ibid.*

*Herbstman,* however, is distinguishable. Unlike the warranty in this case, which intermixes affirmations of quality and performance with disclaimers of scope and limitations upon relief, the undertaking in *Herbstman* did not purport to constitute anything other than a simple promise to repair. There were no misleading or deceptive elements in the presentation; the guarantee remedy limitation was clear and explicit in expression and isolated.

It is to be emphasized that we are here dealing with words of exclusion or limitation contained in a contract document that is

not the product of mutual negotiation or cooperative draftsmanship. The purchaser of a mass-produced consumer article with a standard warranty form or booklet, as in this case, has no opportunity to bargain over its terms. Warranties are prepared unilaterally by the company and distributed automatically with the product on a mass basis. *Henningsen v. Bloomfield Motors, Inc., supra,* 32 *N.J.* at 390. The consumer must ordinarily place considerable reliance upon the fairness and good faith of the manufacturer and its dealers. It has therefore been recognized that the reliance which a consumer necessarily reposes in a seller engenders a corresponding responsibility on the seller. See *id.* at 399. This is especially true where the product, upon failure even in normal use, presents a serious risk of personal injury or property damage. See *id.* at 400.

This principle of fair dealing with the public has long been recognized in other areas. See, *e. g., Kugler v. Romain,* 58 *N.J.* 522, 536 (1971) (terms of sale which are not made clear by mass-marketing sellers to uneducated and inexperienced consumers are not enforceable); *Gerhardt v. Continental Ins. Cos.,* 48 *N.J.* 291, 298 (1966) (exclusionary clauses in insurance policies which are neither conspicuous nor plain and clear are not to be given effect); *Allen v. Metropolitan Life Ins. Co.,* 44 *N.J.* 294, 305–306 (1965) (insured justifiably relies on knowledge and good faith of insurer); *cf. Unico v. Owen, supra,* 50 *N.J.* at 116 (note holder who has knowledge of seller's standardized contract may not be holder-in-due-course of consumer's note because holder took note without good faith). Where trade practices are subject to governmental regulation, advertisements or warranties which do not prominently and conspicuously communicate important exclusions or limitations in clear and readily understandable language are generally regarded as improper or invalid since they serve to mislead or confuse the average consumer. See, *e. g., Montgomery Ward & Co. v. FTC,* 379 *F.*2d 666, 672 (7 Cir. 1967) (advertising of unconditional guarantees when guarantees contained limitations was deceptive advertising); *Double Eagle Lubricants, Inc. v. FTC,* 360 *F.*2d 268, 270–271 (10 Cir. 1965) (can label with oil ingredients printed on side instead of on

face is still misleading and not conspicuous enough to inform public that oil is reprocessed from used oil); *General Motors Corp. v. FTC*, 114 *F*.2d 33, 36 (2 Cir. 1940), *cert.* den. 312 *U.S.* 682, 61 *S.Ct.* 550, 85 *L.Ed.* 1120 (1941) (GMAC "6% plan" could mislead public into believing that annual interest charged was six percent even though careful reading indicated otherwise). *Cf. Donaldson v. Read Magazine, Inc.*, 333 *U.S.* 178, 188, 68 *S.Ct.* 591, 597, 92 *L.Ed.* 628, 640 (1947) ("Advertisements as a whole may be completely misleading although every sentence separately considered is literally true. This may be because things are omitted that should be said, or because advertisements are composed or purposefully printed in such a way as to mislead.")

█ These foregoing principles are relevant to this case. Uniroyal's attempted limitation of its damages for breach of its express warranty was not prominently, conspicuously, and clearly set forth. That failure coupled with the dominant descriptions of Uniroyal's undertaking as being a guarantee dealing with the performance capacity of the tires would lead a purchaser of ordinary understanding to believe and expect that the warranty was an affirmation of quality rather than simply a promise to replace. It follows that Uniroyal's limitation of remedy to either tire replacement or a refund of the purchase price can be given no effect.

For these reasons, the judgment of the Appellate Division reversing and remanding the matter for a new trial is modified and affirmed and such new trial shall be undertaken in accordance with this opinion.

PASHMAN, J., concurring.

I fully agree with the majority that Uniroyal's "guarantee" constitutes an express warranty and not merely a promise of replacement. *Ante* at 327. I also agree that the limitation of remedies contained in the warranty is unenforceable. The majority perceives the disclaimer to be "so deceptive, confusing or misleading as to constitute an inadequate communication to purchasers concerning the [full] meaning of the express warran-

ty." *Ante* at 332. While I agree with this characterization, I write to elaborate a second premise for refusing enforcement. The manufacturer has artfully placed within a "linguistic maze," *ante* at 333, a provision that defeats a consumer's reasonable expectations. This involves not only surprise to the consumer because of a lack of clarity, see *ante* at 330–331; *cf. N.J.S.A.* 12A:2–316(2), (3)(a); *N.J.S.A.* 12A:1–201(10), but the same "unfair surprise," *N.J.S.A.* 12A:2–302, *N.J. Comment* 1, that supported this Court's decision in *Collins v. Uniroyal*, 64 *N.J.* 260 (1974), aff'g 126 *N.J.Super.* 401 (App.Div. 1973). The warranty's limitation is not only unenforceable because of the manner in which it was drafted, it is unenforceable because of its content. Thus, I would follow the approach taken by both the trial court and the Appellate Division and hold the disclaimer unconscionable as a matter of law.

It is clear that plaintiff would be able to seek recovery for the property damage alleged here in the absence of the limitation imposed by Uniroyal. New Jersey's Uniform Commercial Code provides that the usual measure of damages given a buyer for breach of warranty includes recovery for consequential damages. *N.J.S.A.* 12A:2–714(3). These damages cover injuries to property proximately resulting from any breach of warranty. *N.J.S.A.* 12A:2–715(2)(b). A sales agreement may limit recovery for consequential damages "unless the limitation or exclusion is unconscionable." *N.J.S.A.* 12A:2–719(3). "Limitations of consequential damages for injury to the person in the case of consumer goods is *prima facie* unconscionable but limitation of damages where the loss is commercial is not." *Id.* Because this case involves only property damage, plaintiff does not have the benefit of this presumption of unconscionability. The limitation here must therefore be assessed under a traditional analysis of unconscionability. See *N.J.S.A.* 12A:2–302.

The question of unconscionability is one of law for the court. *N.J.S.A.* 12A:2–302(1). The statute, however, does not provide any definition of unconscionability. The comments following *N.J.S.A.* 12A:2–302 offer only the most general sense of direction. They broadly describe the governing principle as "one

of the prevention of oppression and unfair surprise  *  *  *."
*N.J.S.A.* 12A:2–302, *N.J. Comment* 1. Case law on the subject
affords greater guidance, but is similarly lacking in a universal-
ly accepted standard. In one of the leading cases in this area,
Judge J. Skelly Wright observed that "[u]nconscionability has
generally been recognized to include an absence of meaningful
choice on the part of one of the parties together with contract
terms which are unreasonably favorable to the other party."
*Williams v. Walker-Thomas Furniture Co.*, 350 *F*.2d 445, 449
(D.C. Cir. 1965). See *Ellsworth Dobbs, Inc. v. Johnson*, 50 *N.J.*
528, 554 (1967). More recently, this Court in *Kugler v. Romain*,
58 *N.J.* 522 (1971), described unconscionability as "an amorphous
concept obviously designed to establish a broad business ethic"
and noted that the intent of the doctrine is "to make realistic
the assumption of the law that the agreement has resulted from
real bargaining between parties who had freedom of choice and
understanding and ability to negotiate in a meaningful fashion."
*Id.* at 543–544.

By avoiding any precise definition of the unconscionability
concept, "[t]he framers of the Code naturally expected the
courts to interpret it liberally so as to effectuate the public
purpose, and to pour content into it on a case-by-case basis."
*Kugler*, 58 *N.J.* at 543. Thus, in applying these general notions
to a particular contract, a court must assess a variety of factors,
the relevance and significance of which will vary from case to
case. They include the commercial setting, any "course of
dealing," *N.J.S.A.* 12A:1–205(1), or "usage of trade," *N.J.S.A.*
12A:1–205(2), the purpose and effect of the contract, the relative
bargaining strengths of the parties, the presence of fine print,
the conspicuousness of the clause in question, unfair surprise
and the presence of oppressive or manifestly unreasonable
terms. See *N.J.S.A.* 12A:2–302(2); *Williams v. Walker-Thomas
Furniture Co.*, 350 *F*.2d at 449; *Schroeder v. Fageol Motors*, 86
*Wash*.2d 256, 544 *P*.2d 20, 23 (Sup.Ct.1975) (*en banc*); see
generally White & Summers, *Uniform Commercial Code*, § 4–1
to 4–7 at 112–130, § 12–11 at 383–392 (1972); Spanogle, "Ana-
lyzing Unconscionability Problems," 117 *U.Pa.L.Rev.* 931 (1969).

An application of these principles in the present case compels the conclusion that the remedy limitation is unconscionable. The commercial setting in this case evidences a severe imbalance in bargaining power and a lack of meaningful choice by the consumer. Although one party's superior bargaining power is not in itself a sufficient basis for a finding of unconscionability, see *N.J.S.A.* 12A:2–302, *N.J. Comment* 1, it is clearly an important consideration. By contrast, courts are hesitant to relieve strong, knowledgeable and experienced parties from a bargain which they actively negotiated when later events prove the bargain to be less advantageous than one party would prefer. See, *e. g., S. M. Wilson & Co. v. Smith Int'l, Inc.,* 587 *F.2d* 1363 (9th Cir. 1978); *Royal Indemnity Co. v. Westinghouse Elec. Corp.,* 385 *F.Supp.* 520 (S.D.N.Y.1974) (applying New Jersey law); *Wille v. Southwestern Bell Tel. Co.,* 219 Kan. 755, 549 *P.2d* 903 (Sup.Ct.1976); *Abel Holding Co., Inc. v. American Dist. Tel. Co.,* 138 *N.J.Super.* 137 (Law Div.1975), aff'd, 147 *N.J.Super.* 263 (App.Div.1977).

When individual consumers enter into sales contracts with large commercial concerns, the word "bargain" is hardly appropriate. The terms of the agreement are rarely negotiated; more often the stronger party simply dictates them. The consumer is in a "take-it-or-leave-it" situation. He is able to seek more favorable terms only regarding matters as to which any competitors permit deviation. Often he is left without any meaningful choice. See *Ellsworth Dobbs, Inc.,* 50 *N.J.* at 554–555; *cf. Henningsen v. Bloomfield Motors, Inc.,* 32 *N.J.* 358, 403–404 (1960) (applying pre-Code law). This is borne out by the facts of this case. The parties did not bargain over the terms of Uniroyal's guarantee. Uniroyal determined the extent of its liabilities unilaterally.

The result of plaintiff's lack of bargaining power is a clause excluding the manufacturer's liability for any consequential damages for breach of its express warranty. The unconscionability of this limitation becomes apparent once proper consideration is given to the type of product involved—an automobile tire. A failure in the performance of such an item carries a

significant probability that personal injury, property damage or both will result. It is highly foreseeable that the consequences of the tire's malfunctioning will be much more severe than the mere loss of the tire itself. Thus, a consumer's major concern is with safety, not the availability of a replacement. This fact is evidenced in this case by the testimony of the car's owner that he specifically requested steel belted radial tires because he wanted "better" tires.

In my view, both courts below correctly recognized the importance of the consumer goods involved in this case when assessing unconscionability. See also *ante* at 335. In excising the limitation clause from consideration at trial, Judge Shelton made the following comparison:

> [I]f [a] water carafe dripped water out and spoiled a piece of something or other, then it seems to me that it would probably not be unconscionable to limit the liability of the manufacturer of the water carafe, [to] the replacement of the water carafe, because the consequential damage to property resulting from the leaking of water could not ordinarily be foreseen as one * * * which would constitute substantial damage. I think that is in contrast to the manufacture of a tire.
>
> The tire is the essential element of a motor vehicle in keeping the motor vehicle in contact with the road. Many other things can happen to a motor vehicle, but so long as it has brakes and tires and steering, most problems can be taken care of. It may stop. It may not be able to go. The electrical system fails, it can probably be driven off the side of the road. But when a tire fails * * * there is the likelihood of damage resulting. That, I think, is a common fact.
>
> On the question of unconscionability, it seems to me that regardless of whether the damage resulting from the failure of a tire was property damage or personal injury, it would be unconscionable to permit the manufacturer to limit liability to replacement of the tire. *Obviously, the replacement of a tire is something less than $100 in today's market and the possibility of substantial damage from the failure of the tire is something that is a matter of common fact* as the *Collins* case in the Appellate Division indicated. * * *
>
> In the same way, it seems to me that *the reliability of a tire and the consequential damages that can flow from the failure of a tire are such that it would be unconscionable to limit liability to replacement of the tire.* [Emphasis added]

In affirming, the Appellate Division noted that

> the natural and reasonable expectation of the purchaser of the tire is the same as in the case of personal injuries resulting from a breach of the warranty—*concern for the safety feature of the tire to the extent of its potential for property, as well as personal, damage.* It was entirely reasonable for the purchaser of this tire here to have expected to recover the larger loss, damage to the car, and not simply the replacement of the tire. [Emphasis added]

I agree with the courts below that there is no principled distinction between the remedy limitations in this case and those in *Collins*. Despite the difference in the type of damages, the basic considerations which supported the finding of unconscionability in *Collins* apply with equal force here. The commercial setting and type of product are the same. The "natural reliance" and "reasonable expectation of the purchaser flowing from the warranty," *Collins*, 64 *N.J.* at 263, are present in both cases. These expectations render "patently unconscionable" the manufacturer's attempt to limit its damages for breach of warranty to a refund or replacement. *Id.*

This same result was reached in *McCarty v. E. J. Korvette, Inc.*, 28 *Md.App.* 421, 347 *A.2d* 253 (Ct.Spec.App.1975). In that case plaintiffs were involved in an automobile accident as a result of an alleged blowout of the right rear tire. The blowout caused personal injuries to the plaintiffs as well as property damage to their car. Finding the road hazard tire guarantee to constitute an express warranty against blowouts, the court turned to the effect of the following language:

Neither the manufacturer nor Korvette Tire Centers shall be liable for any consequential damage and our liability is limited solely to replacement of the product. [28 *Md.App.* at 423, 347 *A.2d* at 256]

The court concluded that the clause "purports to exclude liability for both personal injury and property damage." 28 *Md.App.* at 432, 347 *A.2d* at 261. It went on to find the attempted exclusion of consequential damages for personal injury unconscionable as a matter of law under *Md.Comm.Law Code Ann.* § 2–719(3) (identical to *N.J.S.A.* 12A:2–719(3)). As to the exclusion of property damages, the court noted that no statutory presumption existed with respect to sales of consumer goods. It nevertheless concluded that "the rationale in *Collins* persuades us that the clause here, which attempts to exclude liability for both personal injury and property damage is so tainted by unconscionability as to warrant deletion in its entirety." 28 *Md.App.* at 433, 347 *A.2d* at 262. See also *Mieske v. Bartell Drug Co.*, 92 *Wash.2d* 40, 593 *P.2d* 1308 (Sup.Ct.1979) (*en banc*) (company lost 32 rolls of individual's exposed movie film, clause limiting damages to retail cost of film unconscionable).

Defendant argues that it is not unconscionable to limit the remedies available to a tire purchaser for breach of a warranty that goes beyond what the law requires. Since Uniroyal could have refrained from giving this "added protection," it is argued, it should be permitted to limit the remedies for the failure of its product to live up to this higher standard. See *N.J.S.A.* 12A:2–316, 2–719, *N.J. Comment* 3; *Collins*, 64 *N.J.* at 263–264, 268 (Clifford, J., dissenting). This same argument was correctly rejected by the Court in *Collins* as "not consonant with the commercial and human realities." 64 *N.J.* at 262. Express warranties are used by manufacturers to increase the attractiveness of their products to consumers. The inclusion of warranties is not a result of corporate benevolence. Conversely, purchasers rely on warranties; they reasonably expect them to have meaning beyond a mere promise of replacement. When compared with those expectations, even a clear disclaimer clause presents an unfair surprise to the consumer. *Collins*, 64 *N.J.* at 263. This is particularly true when, as here, malfunction of the items carries a significant potential for damage to person and property.

For the foregoing reasons, I concur in the opinion of the Court.

CLIFFORD, J., dissenting.

This case asks whether it is unconscionable for a manufacturer to limit liability to product replacement and to exclude liability for property damage in the event of failure of a non-defective product. Both the trial court and the Appellate Division answered in the affirmative. However, the Court goes out of its way to avoid addressing this, the salient issue, choosing instead to decide the case on the basis of a supposed antecedent question: whether the remedy limitation is so deceptive, confusing or misleading as to be unconscionable. *Id.*

The answer given represents a cogent discourse on the concept of unconscionability in contracts law. However interesting that discussion may be, it is entirely academic, for the issue addressed is not before us now. The question of the alleged deceptive pall

of the remedy limitation was not raised in either of the courts below. It was not briefed by the parties. It was not contained in the certification papers before us. To the limited extent that it was adverted to at oral argument, counsel for both parties denied that such an issue was before the Court. The questions that are squarely posed, however, which I daresay sound, basic principles of jurisprudence should dispose us to answer, are these:

1. Does a guarantee provision promising replacement of the product in the event of product failure constitute an express warranty?

2. Is it unconscionable for a manufacturer to limit liability to product replacement and to exclude liability for property damage in the event of failure of a non-defective product?

# I

Uniroyal distributed to the purchasers of its steel belted radial tires a thirteen page red, black and white booklet entitled "Owner's Guide and Guarantee." Among the things described in the booklet are how and when to rotate, align and replace the tires, the terms of the tire guarantee, and service and inspection routines. Only two pages of the thirteen page booklet deal with Uniroyal's guarantee. These pages are divided into six subheadings printed and set off in bold-face red type:

1. GUARANTEE ELIGIBILITY.
2. WHAT IS GUARANTEED AND FOR HOW LONG.
3. HOW PRO RATA CHARGES ARE CALCULATED.
4. WHAT IS NOT COVERED BY THE GUARANTEE.
5. UNIROYAL'S OBLIGATIONS.
6. OWNER'S OBLIGATIONS.

The terms of the guarantee are then explained in language which I confess strikes me more as a model of clarity and precision than as the "linguistic maze" or the "melange of overlapping, variant, misleading and contradictory provisions" perceived by the majority, *ante* at 333. Here are the pertinent guarantee terms:

1. GUARANTEE ELIGIBILITY
   (a) General guarantee
   Applies To All Owners Of:
   * Passenger Cars
   * Light Trucks

* Recreational Vehicles
* Rental and Lease Vehicles
(b) Road Hazards
Applies To All Owners Of:
* Passenger Cars Including Rental and Lease Vehicles in Passenger Car Service
(c) Mileage
Applies To the Original Owner Of
* Passenger Cars Including Rental and Lease Vehicles in Passenger Car Service

2. WHAT IS GUARANTEED AND FOR HOW LONG

Your set of Uniroyal Steel Belted Radial Tires is guaranteed for 40,000 vehicle odometer miles as follows:

(a) General Guarantee—If a tire becomes unserviceable, for any reason other than wearout or the specific road hazards covered below during the first 8,000 miles of operation, it will be replaced at no charge. Thereafter, adjustments will be made on a pro rata charge basis up to 40,000 vehicle odometer miles.

(b) Road Hazard Protection—If within 40,000 vehicle odometer miles the tire becomes unrepairable due to impact breaks, snags, cuts or punctures, it will be replaced on a pro rata charge basis.

(c) Mileage—If the tread on any tire wears down to the tread wear indicators (as defined on page 5, section 1) before 40,000 vehicle odometer miles, the tire will be replaced with a new tire on a pro rata charge basis.

3. HOW PRO RATA CHARGES ARE CALCULATED

\*          \*          \*          \*          \*          \*          \*          \*

4. WHAT IS NOT COVERED BY THE GUARANTEE

(a) General Exclusions applicable to all parts of guarantee.

* Unserviceability or unrepairability or failure or loss due to accident, fire, chain damage, racing, theft, run flat or willful abuse.

* Tires on any car registered and normally operated outside the United States or Canada.

* This guarantee is a promise of replacement under the conditions specified. It is not a promise that your tires will not fail.

* This guarantee is given in lieu of all other express or implied warranties, including but not limited to any implied warranties of merchantability or fitness for a particular purpose. It does not cover consequential damages and UNIROYAL's liability is limited to repairing or replacing the tire in accordance with the stipulations contained in this guarantee.

* Tires transferred from the vehicle on which they were originally installed.

(b) Road Hazard Exclusions

* Tires used on trucks, recreational vehicles, campers, trailers and passenger cars in special applications such as police and taxi service.

* Mileage guarantee voided if booklet is lost or mandatory inspections, rotations and wheel alignment and balance checks and adjustment, if required, are not made, or if tires are operated at improper inflation.

\*          \*          \*          \*          \*          \*          \*          \*

The Court holds that these provisions, while labeled as a "guarantee," have the force and effect of an express warranty. *Ante* at 326. This conclusion, with which I agree, is in accord with settled principles of law. *See, e. g., Jutta's Inc. v. Fireco Equipment Co.,* 150 *N.J.Super.* 301 (App.Div.1977); *Adams v. Peter Tramontin Motor Sales, Inc.,* 42 *N.J.Super.* 313 (App.Div. 1956); *N.J.S.A.* 12A:2–313.

However, it is at this point that I part company with my colleagues. It is not significant whether the tire replacement policy is called a guarantee or a warranty. Neither term has talismanic significance portending immortality for tires, the palladium of motoring, or perpetual immunity from traffic summonses. Once the affirmative statements made by Uniroyal are deemed to be express warranties, the next step is to determine their scope.

It is a matter of common knowledge, judicially recognized, that tires can and will blow out for a myriad of reasons including defect, lack of tire maintenance, road conditions, and the happenstance of striking damaging objects. *Collins v. Uniroyal, Inc.,* 64 *N.J.* 260, 271 (1974) (dissenting opinion); see *Shramek v. General Motors Corp.,* 69 *Ill.App.2d* 72, 216 *N.E.2d* 244, 247 (App.Ct.1966); *Williams v. U. S. Royal Tires,* 101 *So.2d* 488, 492 (La.Ct.App.1958). Uniroyal recognized this and sought to circumscribe its affirmative guarantees accordingly.

Unlike the provisions of the warranty in *Collins, supra,* Uniroyal here made no affirmative guarantee against specific causes for failure of the tires. Rather, it made a promise of replacement under certain specified conditions. Uniroyal further stated, in unmistakable terms, that it was *not* making a promise that the tires would not fail.

We analyzed a similar guarantee in *Herbstman v. Eastman Kodak Co.,* 68 *N.J.* 1 (1975). In *Herbstman* the plaintiff wanted the purchase price of his malfunctioning camera refunded. This Court held that plaintiff's remedy was limited to that stated in the guarantee, namely, repair. In interpreting the *Herbstman* guarantee we decided that the manufacturer did not warrant

the camera to be free of mechanical defects. "Rather, the language used contemplated that such defects might occur, and, if so, Kodak would repair them." *Id.* at 12.

Like the guarantee in *Herbstman*, the scope of the guarantee here is clear. Uniroyal specifically stated:

This guarantee is a promise of replacement under the conditions specified. It is not a promise that your tires will not fail.

The meaning and significance of this guarantee is manifest. It could scarcely be made more plain. However, in its attempt to distinguish *Herbstman* and render the Uniroyal guarantee unconscionable, *ante* at 334–335, the majority subjects the language of the guarantee before us to a myopic scrutiny, dilating the words until they are devoid of any definition. Having ravaged the guarantee, the Court ends its analysis short of reaching the real issue in the case.

## II

The provisions in the Uniroyal guarantee constitute a limitation of remedy.[1] *N.J.S.A.* 12A:2–719(3) specifically provides that consequential damages may be limited or excluded unless such limitation or exclusion be unconscionable. The statute further states that it is "prima facie" unconscionable to limit consequential damages for personal injuries in the case of consumer goods. *Id.* The question squarely before the Court is whether such a presumption of unconscionability should be extended to consequential damages for property damage.

---

[1]The majority correctly distinguishes between disclaimers of warranty and limitations of remedy. *Ante* at 330–331. The exclusion or modification of warranties is covered under *N.J.S.A.* 12A:2–316. The limitation or modification of remedies is found in *N.J.S.A.* 12A:2–719. There are strong indications that the legislature, following the lead of the drafters of the Uniform Commercial Code, intended *N.J.S.A.* 12A:2–316 to operate independently of *N.J.S.A.* 12A:2–719. J. White & R. Summers, *Uniform Commercial Code* (1972) § 12–12 at 395. *See also* Leff, "Unconscionability and the Code—The Emperor's New Clause," 115 *U.Pa.L.Rev.* 485, 520 (1967). This implication is buttressed by *N.J.S.A.* 12A:2–316 *UCC Comment* 2, which states:

* * * This Article treats the limitation or avoidance of consequential damages as a matter of limiting remedies for breach, separate from the matter of creation of liability under a warranty. If no warranty exists, there is of course no problem of limiting remedies for breach of warranty.

The answer to this question is clearly no. The statute distinguishes remedy limitations for personal injuries from remedy limitations for property damage. *N.J.S.A.* 12A:2–719(3). The latter are acceptable and legitimate exercises of contractual freedom by manufacturers. *See Adams v. J. I. Case Co.*, 125 *Ill.App.*2d 388, 261 *N.E.*2d 1 (App.Ct.1970); *Lankford v. Rogers Ford Sales*, 478 *S.W.*2d 248 (Ct.Civ.App.Tex.1972); *Murray v. Holiday Rambler, Inc.*, 83 *Wis.*2d 406, 265 *N.W.*2d 513 (1978); *cf. Ford Motor Co. v. Reid*, 250 *Ark.* 176, 465 *S.W.*2d 80, 85 (1971) ("If the Ford Motor Company intended the repair remedy to be exclusive, as it now contends, it should have stated that intention in express language"). As the Oklahoma Supreme Court noted in *Tuttle v. Kelley-Springfield Tire Co.*, 585 *P.*2d 1116, (Okl.Sup.1978), "[C]ertainly a seller should be able to escape no-fault liability. But this must be achieved in some manner not violative of the code. For example a seller might provide that he does not guarantee the tire will not blow out, but if it does he promises to replace it." *Id.* at 1120. The *Tuttle* court also noted that limitations on remedies are not *per se* unconscionable. *Id.* Those courts which have dabbled in the language of unconscionability when examining limitations for property damage have found the limited remedy to be "not unconscionable on its face" but unconscionable as applied. *Ford Motor Co. v. Mayes*, 575 *S.W.*2d 480, 485 (Ky.App.1978) (incurable noise and vibration from truck frame); *Eckstein v. Cummins*, 41 *Ohio App.*2d 1, 321 *N.E.*2d 897, 904 (Ct.App.1974), rev'd on other grounds, 46 *Ohio App.*2d 192, 347 *N.E.*2d 549 (Ct.App. 1975) (constant vibration and hum in automobile incapable of repair due to inability to isolate defective part).

The judicial refusal to find remedy limitations *prima facie* unconscionable in the case of property damage is supported by a close reading of the Uniform Commercial Code, embodied in this state in Title 12A. *N.J.S.A.* 12A:2–719(3), the section under scrutiny, deals exclusively with consequential damages. *N.J. S.A.* 12A:2–715(2) defines consequential damages as follows:

(2) Consequential damages resulting from the seller's breach include
(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(b) injury to *person or property* proximately resulting from any breach of warranty. [*L*.1961, *c.* 120, § 2–715 (emphasis added).]

Injuries to person and to property are distinguished here. It is apparent, then, that the drafters did not intend the terms to be synonymous in later sections, *e. g., N.J.S.A.* 12A:2–719(3).

This distinction was emphasized in passing by this Court in *Heavner v. Uniroyal, Inc.,* 63 *N.J.* 130 (1973). In *Heavner,* a conflicts of law case dealing with statutes of limitation, the Court quoted *N.J.S.A.* 12A:2–719(3), adding the parenthetical "not to property" after the phrase "damages for injury to the person." *Id.* at 154.

The Appellate Division would extend the presumption of unconscionability in *Collins v. Uniroyal, Inc.,* where limitations on remedy for personal injuries are involved, to situations such as the one before us involving only property damage. But that extension as applied to a non-defective product's damage to property conflicts with the plain meaning of the statute. It further precludes the manufacturer from limiting its liability in any way and has the effect of making the manufacturer an insurer of the public. *See Collins v. Uniroyal, Inc., supra,* 64 *N.J.* at 263, 272 (dissenting opinion); Note, "Presumptions of Unconscionability and Nondefective Products under the Uniform Commercial Code," 50 *N.Y.U.L.Rev.* 148 (1975).

The purpose of the limitation of remedy here was to enable the manufacturer to make a warranty for non-defective goods beyond that imposed by law without "opening wide the floodgate of claims." *Collins v. Uniroyal, Inc., supra,* 64 *N.J.* at 271 (dissenting opinion). As noted in the dissent in *Collins,* the effect of such a clause is laudable in its allowance of this extra degree of guarantee. *Id.* at 272. The effect of ignoring the limitation of remedy here will necessarily be to discourage the making of such promises of replacement.[2]

---

[2]If sellers find that the resulting increase in sales because of such a guarantee generates greater net revenue than is needed to insure against the concomitant personal liability, then they may continue to offer to repair or replace nondefective products. *See* Note, *supra,* 50 *N.Y.U.L.Rev.* at 176. The

Uniroyal's promise here to replace the product in accordance with the conditions specified goes beyond the minimum warranty required by law.  This is not to suggest altruism on the part of the manufacturer but rather to point out that it is at least ironic and probably unfair to predicate liability on an act which is inherently beneficial to the consumer.  As has been noted by one commentator, the Court's holding in *Collins* "places sellers in a strange bind.  They cannot give consumers something extra in the way of remedies without assuming total liability for any personal injuries caused by the failure of non-defective products.  On the other hand, they can refrain from making express warranties and avoid liability for anything but defective products."  Note, *supra, N.Y.U.L.Rev.* at 175–76.

### III

For the foregoing reasons I would reverse the judgment of the Appellate Division which remanded the cause for a determination of whether the express warranty was breached.  On the assumption, nowhere contradicted in the record, that Uniroyal has discharged or is willing to discharge its liability to plaintiff by replacing the non-defective tire, I would remand to the trial court for the entry there of judgment in favor of appellant.

*For modification and affirmance*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, SCHREIBER, HANDLER and POLLOCK—6.

*For reversal and remandment*—Justice CLIFFORD—1.

---

more likely outcome, however, is that the price of the product to the consumer must be raised to compensate for the cost of insurance against *Collins*-type liability.  Thus the consumer will have to pay extra for protection against *nondefective product failure whether he feels this is desirable or not.* It should be noted that this is an area where the consumer is able to protect his interest by purchasing insurance, thus making his own choice as to whether added protection against the consequences of nondefective product failures is desirable to him.